Ms. Stetson, whenever you're ready. Ms. Stetson Good morning, your honors. May it please the court, my name is Kate Stetson. I represent the appellant in this case, Computer Sciences Corporation. We say in our opening brief that this case essentially comprises a contracts law final exam because it brings together about a half a dozen basic contractual interpretive principles with the usual final exam twist. And the twist is this, that there are two contracts in this case delivered to all of these appellants on the same day, signed on the same day, and therefore we all agree that the contracts have to be harmonized, have to be construed together. So the question in this case is whether Judge Hilton correctly granted summary judgment for the appellants concluding that essentially the hourly paid term of an offer letter controlled over the contrary arguably terms of the foreign travel letter. That summary judgment was wrong, and this is why. The foreign travel letter, which is the second of the two documents conveyed on the same day, signed and accepted on the same day, specifically says at its very beginning, this document, we agree, controls the term of your deployment overseas. And among other things, what the foreign travel letter says is while overseas, your base weekly salary will not change, and I'll come back to that. But the foreign travel letter also sets out a number of other things that are specific to service overseas, not just different insurance benefits, not just different hardship pay, which applies whenever someone is deployed outside of the continental U.S., not just danger pay, which someone gets if they're in a war zone. The foreign travel letter also contains something that I assume you picked up on both in the briefs and the joint appendix, which is called a monthly pay differential. And if you look at the monthly pay differential and you read the 30B6 deponent's description of what that's for, the monthly pay differential keys off of the level of effort that these employees expended while working overseas. And specifically, the monthly pay differential, and this is at page 471 of the joint appendix and, again, at page 599 and 603, that pay differential was specifically intended to make up for hours worked over 40 hours a week. That's the... I'm sorry. So the citations that you just gave us, how does that support your proposition? They support our proposition in this way. What the appellants would have you do is to take everything that I've just described in the foreign travel letter, the base weekly salary, which everybody agrees is 40 hours times the hourly wage, plus the pay differential, which is 50% of their salary, plus hardship pay received while you're overseas, plus danger pay if you're in a war zone, and then stack on top of that an additional hourly wage. So it's not that what the appellants are essentially trying to do is not to harmonize these two documents, not to give weight to the word salary. They're essentially stacking the two documents on top of each other and saying... You're trying to tell us that the foreign travel letters supersede the offer letter at least while the employees are overseas. So I'm not sure that you're not doing exactly what you're suggesting they're doing. Right. I think, Judge Duncan, the foreign travel letter certainly does, as you say, supersede aspects of the offer letter while they're deployed overseas. Among other things, I mentioned that the insurance benefits that you would get when you're an employee of Computer Sciences Corporation deployed overseas are different from the benefits that are specified in the offer letter that would govern if you were employed stateside. So certainly for certain purposes, Judge Duncan, the foreign travel letter essentially trumps. But that doesn't mean that we're not trying to harmonize it because, of course, I'm willing to take that hourly rate that is specified in the offer letter because that's what translates into the salary. So, for example, George Richel's offer letter specifically says, here's your hourly rate. It's $32 and change. That amounts to a $68,500 salary. That's the base weekly salary. Well, why wouldn't it just say no overtime? I mean, this could have been, if that's your argument, why didn't it just say that? I think a couple reasons, Judge Biggs, and here I have to speculate, so I hope you'll forgive me, but first of all, we know that the Fair Labor Standards Act doesn't apply overseas. So the concept of overtime, as we understand it stateside, doesn't apply. The second thing is when it comes to service in Kuwait per government contractor, an 84-hour week is actually standard time. So that's why these folks aren't asking essentially for hourly pay plus time and a half for overtime as they would if they had been employed in the U.S. and billing hours over 40. They're asking for straight hourly pay for every single hour they worked, but they're asking for it essentially stacked on top of all of those specific compensations that they get precisely because they're deployed overseas. So the effect, as I said, isn't too harmonious. Well, pay differential is left entirely to the discretion of the manager. You could, in theory, not give them any pay differential, right? You could, but if you look at the depositions in the record of our 30B6 deponent, whose name is Barkley, and the deposition of Noel Camp, what you'll see is with respect to this particular job, which is called Task Order 9 in contractor speak, Task Order 9 pay differential was specified as 50 percent of the salary. And you'll see that actually, I think not in Rochelle's foreign travel letter, but in the foreign travel letters of every single one of the Rhodes appellees. How is this responding to Judge Diaz's question? You're saying that it's specifically calculated, if you will, the method for arriving at it, but that doesn't seem to me to address this question, which was also my question. Is it the manager has the discretion not to give it at all? The manager certainly does, I think, by the terms of the foreign travel letter, have discretion not to give a monetary differential. But my only point in response to Judge Diaz was, in this case, where you've got employees working on this particular task order for these particular hours, the monetary differential was 50 percent of their base salary. So that's why, for example, if you look at George Rochelle's offer letter and it says $68,500 annually, you'll see at some point later in the briefing and in the joint appendix that Mr. Rochelle was actually on the order of about $162,000 a year. And that's because under the foreign travel letter, that was his base salary plus the pay differential, plus hardship, plus danger, plus per diem and so forth. Could I just clarify? I'm still a little unclear about how you see the relationship between the offer letter and the foreign travel letter. You're not saying, are you, that they are independent? No, I'm not. You're saying that you get to pick the foreign travel letter and ignore contrary language in the offer letter under certain circumstances. Well, I think for the most part that's right, Judge Duncan. Maybe the way that I would put it is, as I said at the beginning, we all agree that we've got to find a way to read these two together. And there are aspects of the two documents that simply cannot post up against each other. You don't get the same benefits that are specified in the offer letter when you're overseas. So why can't the reference to the $68,000, why can't that just be read as reflecting the hourly rate annualized over 52 weeks and 40 hours a week? Oh, I think it can, Judge Duncan. But that's sort of our point, is that when you have the hourly rate that is annualized, that's what's called the salary. And everyone agrees. If you look at the appellee's brief at page 16, they agree and understand that when you talk about a base salary, whether you're here or in Kuwait, you're talking about the hourly rate times 40 hours a week times 52 weeks a year. That's your base salary. You're telling us that these two things, these two offer letters should be reconciled, should be read together. How in the world would an employee know? However, you're also telling us that some things are specific to the travel and some will take some from the offer letter. How would anybody, how could there have been a meeting of the minds on this? That's a question that we raise as well, as you know. If there was that much divergence between what the computer sciences recruiters and employment folks understood this letter to be saying with respect to foreign travel and the salary, and what these employees understood, then there was no meeting of the minds because a salary term is an essential term. So what's the remedy in that circumstance? In that circumstance, the contract would be void. So they get nothing? No. Presumably they would get some quantum merit. You'd find some equitable principle to substitute for all of the other compensation that they would have received under the foreign travel letter. I don't know that that puts you in any better position, frankly. Well, Judge Diaz, in fact, if we were to look just at a straight hourly wage, and you can find this, I think, at the declaration of Brooke Kania in the joint appendix. If you look just at a straight hourly wage for these folks, they actually got paid more under the foreign travel letter than they would have under a straight wage. So but in response to Judge Biggs' question, I think the answer is you would look at a couple specific textual tells. One of them is that it says at the top of the foreign travel letter, this governs our agreement when you're deployed overseas. These are all the terms that are going to govern your work. And one of those terms, of course, is your base salary won't change. So essentially that's where you do borrow, Judge Duncan, the hourly rate that gets factored into the base salary. But then when you're brought overseas, you're paid a salary. You're paid all sorts of uplifts, they're called, like the differential and the hardship pay that we've talked about. That's how they would understand. But in response to your subsidiary point, you're quite right. If there wasn't a meeting of the minds on this, I think then we have the problem that Judge Diaz identified. But perhaps before we get to no meeting of the minds and what we maintain is a pretty unambiguous clear way to read these two contracts together, there's also the potential for an ambiguity. Now what Judge Hilton did was he looked at these two contracts. He concluded that they plainly required payment of an hourly wage on top of all of the salary and uplifts of the foreign travel letter. And then he said, but even if these were ambiguous, I'm going to apply contra proferentum and therefore computer sciences loses because computer sciences was the drafter. The problem with that, as we explain in our brief, is that contra proferentum is essentially like sudden death over time. It comes into play when all of your other evidence is essentially an equipoise and you don't know how to declare a winner. Because contra proferentum, of course, does declare a winner. Essentially if a document can be read two ways, it's construed against the drafter. That's why, as we point out in our brief with respect to Florida law, this is a doctrine of last resort. And the Rhodes appellees are actually quite candid in agreeing that with respect to contra proferentum, yes, doctrine of last resort in Florida, and they say at some point in their briefing, Virginia law doesn't use that same phrase, but it essentially gets you to the same result. Because what Virginia law says is, you use contra proferentum if all of your other tools of evidence have failed you. So the problem with what Judge Hilton did here was that he essentially leapfrogged all of the parole evidence that makes up your massive joint appendices in this case, and he went right to contra proferentum. So even if at the end of the day you can't find your way to reconciling these two documents. Actually he found the language of the offer letter to be unambiguous. And he simply said the armed travel letter not to the contrary. And he didn't, he just said if there were ambiguity, but he didn't find it. Oh, but that's my point, Judge Shunkin, is if in response to Judge Biggs' question, if you conclude that in fact there is some ambiguity, then what Judge Hilton did wasn't really the belt and suspenders that he should have used. What he should have done was to take into account how these recruiters approached these employees, what the employees understood when they understood it, which is part of our acquiescence argument, and so forth. So for all of those reasons, I think if you conclude that these documents are susceptible to two reasonable readings, if someone could look at it and say, I think I'm still being paid an hourly wage despite salary differential and so forth, and if somebody else could look at that and say, well, of course, salary means salary, and you get all of these other uplifts on top of that when you're deployed overseas, QED, if those are two reasonable interpretations, then we go back to Judge Hilton for him to do the kind of examination of the parole evidence that he should have performed. Now let me say one word on acquiescence, a few words before I sit down. And this, of course, goes just to damages, doesn't go to liability. But it was very clear to these employees, all of them, within a matter of weeks or at least a few months after they were being paid a salary because their pay stub said salary. So this isn't a circumstance as is sometimes the case in wage cases where you can't tell from the face of your pay stub that there is some discrepancy in what you're being paid, for example. It was very clear to these appellees that they were being paid a salary. That's why they started asking questions about it. And when they were told, you're overseas employees and therefore you're paid a salary, that's how this works in the government contracting business, they stayed on the job. They said their only alternative to challenge what they saw as a differential was to quit? I think there probably would have been. And I'm not aware of what the specific administrative processes were. And I know my time is up, if I can finish my answer. I'm not aware of the specific administrative processes. But they certainly didn't pursue any other kind of grievance. They didn't lodge an objection and then continue to pursue it. They said, why does this say salary? I thought I was getting paid hourly. And they were told, you're getting paid a salary because you're an overseas employee and that's why you're getting all of these other benefits as well. And they stayed on the job. So it's a damages limitation. It seems to me that you're using acquiescence to supplant the statute of limitations. That's what we have statute of limitations for. No, I don't think we're asking it to do the job of the statute of limitations. I've never heard the theory of acquiescence in the context of a breach of contract claim. And how do you apply that? I mean, how long does an employee have to accept the salary before the theory actually takes root? And how far does this notion extend? If a woman is being paid less than a man and she knows that, does she have to quit to challenge the inequity? I'm unfamiliar with this theory in the context also. No, Judge Duncan, I don't think she would have to quit to challenge the inequity. I think there probably is some middle ground, which is what I was referring to as some kind of grievance process that you could pursue. But there's no such, you're saying that, and then it goes back to Judge Diaz's question, what's the point of a statute of limitations? I think the point of a statute of limitations comes into place particularly when somebody doesn't know from the face of her pay stub that she's not getting paid what she should. And then it runs, of course, now we know, from the time that she discovers it. But that's not the case in this case. With respect to these appellees' damages, these appellees all understood within a matter of weeks or months that they were getting paid a salary and that that was how it worked overseas. Did you make a statute of limitations argument? I don't think we made an argument. We might have lodged it as a defense in our answer, but I don't believe we made an independent argument below. But one last point, if I could, and that is this I believe Judge Diaz has a question. No, I've asked a question. Okay, thank you. You may finish your sentence, but your time has expired. Okay, just to quantify this somewhat, what we're talking about here isn't just these five Rhodes appellees and Mr. Rochelle. There are actually hundreds of employees that are subject to the same task order that would be subject to the kind of straight hourly pay argument that these appellees are making here. So this is not a de minimis issue. It rides on... That's five sentences. My apologies. Thank you. Thank you. I think we took your argument. Okay, thank you, Judge Diaz. Ms. Murthy? Good morning. May it please the Court, Anjali Murthy for the appellee George Rochelle. One thing I'd like to start out with is just to correct a misstatement in opposing counsel's initial argument, which is she quoted the foreign travel letter as saying that this letter controls or governs the circumstances applying to deployment. What it actually says is this letter confirms our mutual understanding regarding your deployment. I think that's an important distinction because it creates... There is no ambiguity that these terms and understanding as stated in a contemporaneous document, which has to be harmonized and we think as Judge Hilton correctly found is easily harmonized with the foreign travel letter. Understandably so because of the consequences. CSE is trying to create factual ambiguities here where there just are none. These are two very simple, easily understood terms. Hourly rate... CSE actually intended this result for your clients? I don't know what... You may not know the answer. Pay an hourly wage on top of a pay differential of over 50%. I think it's difficult to know what CSE intended because there are 10 workers, actually 12 workers, which is a full 10% of the people deployed in Kuwait who were actually paid an hourly rate for all of their hours worked. CSE claims now that that was a coding error, but they were paid their pay differentials, et cetera, in addition to an hourly wage for all hours worked, which of course in being paid that did not change their base salary. Their base salary remained the same. All their other benefits could be calculated, their uplifts, et cetera, while their base salary remained the same even though they were paid an hourly rate for every single one of their 84 hours a week. It's difficult to say what CSE intended. I do believe that it's clear that saying $33 an hour sounds a lot better than saying $15 an hour when you're trying to convince somebody to go over and work in 100 degree weather in a war zone. If what they're saying is true, that they somehow intended it to relate to an 84 hour week instead of a 40 hour week, you're talking about a $15 an hour rate or maybe even a little bit less as opposed to what they actually were paying. So it was at the very least disingenuous to list a $33 an hour rate when you never intended to pay $33 an hour. The $33 an hour term is easily harmonized with the only statement in the offer letter that relates to actual compensation for hours worked, which is the base salary, and all that says is your base weekly salary will not change as a result of this assignment. Well, it will not change from what? It has to be what's in the offer letter. There's just no other way to read it. There were 100 other ways they could have phrased this. They could have said you will only be paid your base salary plus uplifts and differentials, et cetera. They could have put in the contract that the differentials were meant to cover additional hours worked. If you look in the 30B6 testimony, I don't have the sites handy, unfortunately. If you look in there, you'll see it does not say anywhere in that testimony that it specified that that was somehow to make up for an hourly wage because as you have correctly pointed out, that amount was completely at the discretion of the manager. And we are not arguing here somehow that there had to be paid. The FLSA requires payment of an overtime premium. We're just saying payment for all hours worked. You set an hourly rate. You didn't have to say an hourly rate. They could have just said this is your salary and used the word salary, not base salary. Base salary has a very, very particular meaning that is different from a salary. My paralegals get paid a base salary and they also have an hourly rate. They get paid for their hours over 40 and their base salary stays the same. Our law firm is enterprise covered under the FLSA, but if we were not enterprise covered and I did not pay my paralegals for their hours over 40 at a regular straight hourly wage, I would certainly expect that they would sue me for breach of contract for not paying them for all of their hours. With respect to, I think that because there is no ambiguity there, we never even get to any of the, Judge Hilton threw in as many courts do as the 11th Circuit did in the Coelho case that we cited. He threw in, if there's an ambiguity, it doesn't matter because contra proferentum applied. I don't think he leapfrogged over parole evidence. All of that evidence was before him. It is ambiguous. I could list for the court the reasons it's ambiguous, but at the very least, the fact that they paid certain employees for all of their hours while they worked over there, the fact that Mr. Rochelle himself has averred that he intended to be paid an hourly rate. How did you address their acquiescence argument? Well, under Florida law, to the extent that the court acknowledges that the doctrine of acquiescence exists, I was not comfortable in our brief just saying that that theory should not exist because I wanted to make sure that we addressed it. But to the extent the court looks at that doctrine as a valid doctrine of contract interpretation, under Florida law, the doctrine of acquiescence requires three elements, and that is a modification, notice of that modification, and acceptance of the modification. And they haven't met any of those elements under Florida law to the extent that this can be applied. So, first, with respect to the modification, their 30B6 witness denied that any modification other than Mr. Rochelle receiving a raise to his salary occurred, and he specifically stated that that raise left all other terms of the offer letter in place, that that didn't change the terms of the offer letter. Other than that, he denied there being any other document that modified the contract. In addition, what they're essentially saying is that the breach was the notice of the modification, that in breaching, somehow Mr. Rochelle should have become aware that the contract had been modified. And that's just not what that doctrine requires. In addition, a pay stub under Florida law is not sufficient notice of a modification. And they've been arguing this entire time that there was no modification of the contract, even in their brief. They say, if there was a modification which we don't concede, it seems to me that the very word modify requires some volition to modify something, and they don't acknowledge that they even did that, so how could they have given notice, something they don't acknowledge they did. Finally, with respect to acceptance, they say that they sort of made it sound like people complained very early in the process about not being paid a salary. Mr. Rochelle averred in the record that while he wasn't, he didn't, the pay didn't seem to be right to him. He didn't look at the particular categories of pay in his pay stub, and that in not looking at those particular categories of pay, because different contractors categorized pay differently, that he didn't realize until, A, he saw that people were being paid at an hourly rate for all of their hours, and in doing that, were making twice as much as he was making. And also, when CSC then sent replacement foreign travel letters, and I think that's very key, when CSC wanted to make a modification, when it realized it had this issue, it knew how to do it. They created a new foreign travel letter and sent it out to everybody once they realized they had this problem. That's how you, I mean, we don't acknowledge, actually, that that is a proper modification of the contract either for reasons that aren't before the court here today, but to the extent you are going to modify a document, they knew it wasn't through pay stubs. They knew, oh, well, we'll just change their pay stubs, and maybe they'll notice, and maybe they'll see. So I think with respect to acquiescence under Florida law, certainly, to the extent that doctrine exists, they have not met any of the elements. In terms of the meeting of the minds, which I believe we touched on briefly, they've also not met any elements under Florida law to say that there was no meeting of the minds. Florida law is very, very clear on this point. It's not about, it's not a subjective test. It's not about what the parties meant. It's about what they said. The parties agreed to the same document, there was a meeting of the minds. All the time it happens that people then disagree about what terms mean, but as long as we're not talking about two separate documents, there's a meeting of the minds. The one case they cite where an ambiguity created not a meeting of the minds was the King v. Bray case, in that it was a case for it was pretty clear that in cases of specific performance, when you're going to have to make somebody do something, maybe you have to have, maybe it's a slightly different standard, but that same court came back later, in a later opinion, and said, when you're talking about contract for damages or a case for damages, which this is, much less degree of clarity is necessary with respect to meeting of the minds. Further, their argument that it goes to an essential term, I think, is wrong because all the essential terms are in there. It's not that there's a disagreement about whether he would be paid at all. The disagreement is about how much he would be paid, that happens all the time. We have several cases, if I can just finish my sentence, we have several cases in which essential terms were disputed, such as payment of rent in a rental agreement, payment of attorney's fees in the May v. Sessoms case, which I think we all agree is important, and the court was able to interpret that and didn't find that there was no meeting of the minds. That's all I have. Thank you. Mr. Farrell? If it pleases the court, my name is Mike Farrell, I'm from Jackson, Mississippi, and I, along with my co-counsel Farrell Egge, from Alexandria, who is also my cousin, represent the five Rhodes Plaintiffs, who we collectively refer to as the Rhodes Plaintiffs. In this case, I was interested to hear Ms. Stetson make the argument, you know, that this case would make a great law school examination. Well, when I was in law school, I never had an exam that was this easy. This is a simple case. Judge Hilton saw it as a simple case. They complained about the fact that he wrote a real short opinion. Well, he didn't have to write a long one, because when you're offered $32 an hour, you know, there's not much way, not that many ways to construe it, other than $32 an hour. And so it is a simple case. Briefly, there were two letters. In fact, they also, Ms. Stetson also made the argument that, well, we're stacking these letters they got. Well, we didn't stack them. CSC stacked them. They sent them together to all of the plaintiffs in this case. They sent one letter that was an offer letter, said $32 an hour, plain as day. There was some other language in there, welcome aboard, and that kind of general language, but the operative term was $32 an hour. They also sent a second letter at the same time, called the foreign travel letter, and this included some fringe benefits. And they called them uplifts or extra pay. And there was one for differential pay, hazardous duty pay, danger pay. Now, where it gets a little interesting is that all of those are based on a salary. And they say, well, depending on the discretion of the manager, we're going to pay you a percentage of your salary in terms of those fringe benefits. Now, as far as the Rhodes plaintiffs are concerned, that is not a challenged issue. Nothing under the foreign travel letter is at issue in this case. They never contended they weren't properly paid differential or the hazardous duty pay or any of that, since that was paid at the discretion of a manager, and it could vary. It didn't make much difference to them. They have never made an issue in this case that they were improperly paid under the foreign travel letter. The only thing they're complaining about is the other letter, the offer letter, and that simply said $32 an hour. Now, CSE makes the argument that, in fact, again, they used the language in their brief that the foreign travel letter trumps or overrides or supplants. In fact, in the oral argument today, they again used the word one controlled the other. As Ms. Murthy pointed out, foreign travel letter doesn't say that. It simply said, if you're overseas in Afghanistan, you're going to get this extra pay. They also make the argument in their brief that if you're in the United States, you get the offer letter, the $32 an hour, and if you're overseas, then you get those fringe benefits. There's nothing in the record that supports that. In their briefs and in their briefs, one was applicable to domestic work and the other was applicable to overseas work. It's simply the argument of counsel. There's nothing in the record to support it. In this case, the reason this case is so simple, in fact, it's a little simpler than the George Rochelle case because in George Rochelle, in his offer letter, it said $32 an hour. And then in parenthesis, it had this, you know, annualized figure of 67,000. You know, that's an issue that they have dealt with. But with respect to the Rhodes plaintiffs, it simply says $32 an hour. Now it's very difficult to argue before this court that $32 an hour really means $14 an hour, but that's exactly what CSC is doing. We've challenged them, show us in those contracts where you can construe the term $32 an hour to mean $14 an hour. It simply can't be done. Now, below, in the district court, in their briefs there, they had two arguments. And they said, well, you know, we just took that hourly rate of $32 an hour and we converted it to a salary. Now, there's no basis in the contract that would allow them to do that. But below they argued, well, you go on Google. Google's got some formulas where you can convert an hourly rate to a salary. They also said that the industry standard in converting an hourly rate to a salary is to do it based on 40 hours. Significantly, they don't repeat those arguments in this court today. The only justification for their claim, why they are construing the contract to be $14 an hour, is that that's what we paid the plaintiffs. You know, they eventually realized they weren't getting $32 an hour and they didn't comply. Well, they did complain. They admit that. But they didn't quit. It kind of gets into the argument about acquiescence. And if they didn't quit, did they acquiesce? As we pointed out in our brief, acquiescence is a defense unknown to the law of contracts. It's a phony defense. It does not exist. In their brief, they relied on cases where a party unilaterally amends a contract. They did that in this case eventually. When the problem came to light, they didn't talk about acquiescence. They called everybody in. And you're going to sign, if you want to continue working here, you're going to sign a new foreign travel letter. And that foreign travel letter specifically said you're going to get $1,300 a month salary. We haven't asked for any damages after that point. We understand they fixed their problem. What we're talking about is the liability that they have prior to that. Did you say $1,300 a month? A week. I'm sorry. I'm sorry. Did I say a week? That would have been quite a deal. I'm sorry. I misspoke. It's roughly $1,300 a week in a salary. And it clearly specified this is a salary. And that's what they should have done from the get-go. And I know some of your questions asked about, you know, well, tell us why. Why didn't they just fix this in the beginning? You know, if you're going to pay somebody $1,400 an hour, why don't you just put that in the offer letter and be done with it? And you know, Ms. Stetson was allowed to speculate as to their reason. And I'd like to speculate as well. You know, I don't think you could get people, you know, to leave their family for up to a year at a time, go to work in a remote, hot, dangerous place on the other side of the world and say, we're going to pay you $14 an hour. It made it a lot easier for them to say it's going to be $32 an hour in order to be able to recruit people to do the kind of work they were doing. Now, my time is about out. I do want to address one point, and that is the choice of law question, because that's unique to the Rhodes plaintiffs. We all agree that Mississippi law, the choice of law under Mississippi law, controls this case. That's what the district court held. Mississippi follows the restatement, Section 188 and 186. Section 188 talks about geographical considerations, the place of the negotiations, the place of the contracting, residence of the parties, and other factors like that. Let me just call out those locations. I would like for the court to listen to how infrequently I mention Kuwait. In terms of the place of negotiating for the plaintiffs, was Iraq, Afghanistan, Texas, Texas, one was in Kuwait. As far as CSC, all of their negotiating was done at their headquarters in Virginia. With respect to the place of contracting, again, Iraq, Afghanistan, Texas, Texas, Kuwait, Virginia for CSC. In terms of the residence of the parties, we have Mississippi, two in Georgia, South Carolina, and CSC is a Nevada corporation headquartered in Virginia. The only factor that would militate in favor of Kuwait is the location of the subject matter. There's only one. The final factor under Section 188 is where the contract was performed. The plaintiffs, for the most part, performed in Kuwait. Some did some work in Iraq and also Afghanistan, but not much. But as the district court noted, all of CSC's performance was done in Virginia. And so if you just do a head count, clearly Kuwait is not the center of gravity. There are a lot of geographical locations that have some gravitational pull on this case, but the only place that's really the center of gravity would be Virginia, and the district court correctly applied the law of Virginia. The final factor, Mississippi follows Section 188 are the primary considerations. Also Section 6 of the restatement is secondary. One of the secondary factors is the ease in determining the applicable law. My time is up, can I finish this point? You can finish. Okay. They argued the law of Kuwait. They had an affidavit from an expert who cited three sections from the Kuwaiti Code. They may have been a little embarrassed about the paucity of that information, so they threw in the Afghanistan Code, and they also quoted provisions of the Iraqi Code. I went to a local law library to try to – I think we take your point. Do you want to summarize? We just ask the court to affirm the judgment below. Thank you. Ms. Stetson, you have some rebuttal time. Thank you, Your Honor. Just a few quick points. The first point is when you have several folks coming at you and telling you that these two contracts, when read together, are unambiguous, that suggests that at the very least there is an ambiguity. When there are two reasonable interpretations, one of them being that the salary carries some weight here and is entitled to significance, and one of them being that the hourly wage essentially overrides that, the proper approach then is to find it ambiguous and send it back to Judge Hilton for him to do the kind of parole evidence analysis that he should have done. It wasn't implicit that he did it, as Ms. Stetson said, in contra preferentum and declared it a day, and that wasn't appropriate. So if you conclude that there's ambiguity here, we think it's properly read in our favor, of course, but in that event you should send it back. With respect to Judge Diaz, you asked Ms. Murthy a question about whether she thought this was what computer science is intended, that they get paid hourly, stacked on top of everything else, and she said, well, certainly it was because they had about a dozen employees who were paid hourly. Here's the problem with that. At Joint Appendix 417, we point out in the 30B6 deposition that those 12 employees were erroneously coded and that we actually, we CSC, had to pay the government back for every hour that we misbilled the government because those dozen employees were miscoded. So essentially – But isn't it something of an inference that you realized that you made, that your foreign travel level didn't, was not, that your foreign travel level was so easily read as simply complementing the, and the offer letter, which is unambiguous that the offer of employment is for the non-exempt position because you changed that, too. Well, it's interesting, Judge Duncan. We did change it in May of 2012, and the appellees have conceded that that changed letter is unambiguous, but what the changed foreign travel letter says – remember, the offer letter didn't change. The offer letters still talk about an hourly wage. What the foreign travel letter now says is, your base weekly salary will not change. That's the same. And then it says, your base weekly salary is X, and it's got the number in. So basically, all the new foreign travel letter did was the math. Everybody agrees that the unambiguous – But that would be a pretty significant change because as the foreign travel letter now stands, the base weekly salary has nothing else to refer to than the offer letter. Understood, Judge Duncan, but everyone agrees and understands, including in the briefing below and in this court, that a base weekly salary is based on a 40-hour week. So the question really comes back, I think, to the question that Judge Diaz posed, is if people really are struggling this much, and if, Judge Duncan, there really was a lack of clarity about that early foreign travel letter such that it was ambiguous, what did CSC intend? Did CSC intend that folks be paid an hourly wage on top of all of this? No, of course they didn't, and the parole evidence shows as much. But I want to make one last point, and it has to do with this – Why did it use the term base salary in the travel letter? Why didn't you just say, your salary? Judge Biggs, the base salary is a term of art, and what it essentially refers to is your annual compensation, exclusive of bonuses, exclusive of, in this particular instance with these employees, the kinds of monetary differential and uplifts and hardship pay, per diem, transportation, housing, all of those things. In the usual case, when you're looking at stateside employment, you talk about a base salary plus a bonus. So, for example, law clerks are paid a base salary. They don't get paid hourly over 40 hours a week. They just get a base salary, because that's their comp. They get benefits, which have some value attached to them, but that's not part of their base salary. But here, the base salary, the idea – and I do need to correct this unfortunate misimpression – the idea that these employees were paid $14 an hour when they were working overseas is false. And it goes back to Judge Diaz's point earlier. What these employees were paid, once you add together their base salary, the 50 percent salary differential, the overseas pay – Which they did not have to receive. Which they did not have to receive in the foreign travel letter, but which they did every single one of these employees receive. But it was not – I don't think you can take advantage of that in the calculation since it was discretionary, is my only point. Right, Judge. And the other thing, I guess, I'm a little unclear. I'm interested in your answer to Judge Biggs' question about the difference between a base salary and salary. Could you go over that one more time, as you understand it? Sure. I know my time is up, but if you'll indulge me. If you would, please. The difference between a base salary and salary, I think, is just that in the usual course, when that term is used, it's a labor law term of art, and it means your annual compensation. It doesn't mean your bonuses or your benefits or, in this circumstance, the kinds of uplifts that were applied. But if I can just return to the last point I was making, Judge Duncan, once you add together all of those things, and this is what I said to Judge Diaz earlier when I was comparing straight hourly pay versus everything they received overseas, these employees received over $37 an hour. If you can, and I'm taking exception to your premise, that you get the benefit of a factor that's purely discretionary. I see, Judge Duncan. If I may, just on that one point, because I think this is important on this record. And it doesn't matter that they did receive it. That doesn't aid the analysis. But I think, Judge Duncan, it does in this respect. Each of the appellees on the roadside had it specified in their letter what their differential would be. And Rochelle doesn't contest that he, too, received a 50 percent differential. So for all of these folks, it wasn't just a promise. It was delivered. And these folks made over $37 an hour, not $14. Thank you. Thank you very much. We will come down Greek Council and take a brief recess.
judges: Allyson K. Duncan, Albert Diaz, Loretta Copeland Biggs